Good morning, your honor. May it please the court, James Van Zandt for defendant Karl Popovski. This case presents a fairly obscure sentencing question regarding loss amount, but it's very consequential. And to boil it all down into one idea, the government's position is that when dealing with credit card fraud cases, all it has to do to add up the loss amount using application 03-F1 is to identify how many cards were involved, and that's it, or card numbers or anything like that. You do have this language that the Sixth Circuit focused on, showing that the drafters of the guideline meant the term unauthorized access device to encompass, not just the ones that you can pop into an ATM and get some money out of or use as a credit card, but expired, revoked, canceled cards, devices, I should say. So why doesn't that argue in favor of the approach the district court took here? That was actually something the court addressed, the Ninth Circuit addressed in Agnus Dei, and the Sixth Circuit also talked about in Visniaskis, which was the case that Moon cited. And the idea was if these cards are shown to be used, that's the easy one. That's obviously usable. And can I just also throw in the idea that this is an intended loss standard? We're not talking about restitution, we're talking about the sentencing guidelines. Right, restitution is not an issue in this case. Right, so ex ante, Mr. Popovsky probably didn't know which of the devices he had in his portfolio were going to work and which ones weren't. So why isn't the intended loss, all of them, even if some of them in the end prove not to be usable? That actually might matter. I thought about that quite a bit, Your Honor, because it's an interesting issue on the application that we're using here. What the government proceeded on was the 3FI $500 presumption. It was kind of a proxy for figuring out loss. It's not a situation where the government had actual loss where they knew exactly what was gotten out on each of these accounts. They also didn't have intended loss because they didn't know what he was trying to get out. But they do know he has lots of access devices. Well, they know he had a lot of cards, and that's, I think, the core issue here is the defense's position is that cards does not equal access device. And that's what the Ninth Circuit was talking about in Agnuso. But they later kind of back off on that. They realize, oh, you know, actually these cards maybe are all useful in some fashion or another. And I guess in my own mind, when I cross-reference that with the fact that intended loss is enough, it's hard to see, especially with this fairly conservative approach. They pull it down to $131,000-some dollars. It started out way higher. Well, that was part of the problem was there was some double-counting. There were some that were outside of the statute of limitations. Right. So they adjust for that. There were some other things. They adjust for that. Right. And the thing that Agnuso was looking at is because of the way the access device deposition is written, it actually does require this usability. And that's what they found. Usability is not a difficult standard. And that was something that even in Agnuso, they went back and they were able to do it. Right. They went back and said, oh, you know, you can actually use expired, revoked, canceled. Right. You know, you can use them for ID. You can open up new accounts. Sure. And that's not a position. We're not saying that this is hard and the government can't do it in every case. What we're saying is it has to happen. And what happened in Agnuso- And he attempted to withdraw funds with the cards. I'm not sure of what else you think he has to do. Well, that goes to the usability question, Your Honor. And that's somewhat what Agnuso was talking about because it's entirely possible that we've got a situation where what the defense was saying here is we're willing to say, of course, he used 84 cards, 42,000. That's not an issue. That's not a problem. But these other cards, we don't know why they didn't work. We don't even know whether these were even real card numbers. And that's the issue with this case is because of the way that the government's proof is put together, it's based on essentially wiretaps of people talking about things. We don't know a lot about what the actual things were other than the fact they were numbers that were put on cards. Why isn't the case that I'll just take expired. I mean, that any expired card, you wouldn't know until you actually tried to do something with it, whether you could actually extract some money based on the use of that card. And yet the guidelines include them. It seems like you want there to be like a number by number, card by card, account by account test. And I don't see that strict a requirement in the guidelines. I think it depends on it's a bit of a case by case basis, Your Honor. I certainly will agree that under Agnuson, under Visnioskis, those expired cards can be usable, but we don't know when and how. And that's the core problem in a lot of these things. And Agnuson talked about that, especially in later cases. I think it was, I can't pronounce the name, Dobazgen, where they talked about something similar like that. Expired cards, revoked cards, things like that, they may be usable for something, but that's evidence that the government has to put in or the parties have to agree about it. I mean, it's entirely possible that, you know, if the government were to put in evidence where the defense could agree on that and say, yes, of course, these under these circumstances are usable under certain circumstances. But that doesn't obviate the problem that the statute still requires some threshold showing of usability. And that's essentially what this case is about. So where does the statute have this usability criteria? In what language? In Section 1029E3, which is what's being referenced by application of 305, it defines access devices as any card, plate, et cetera, et cetera, that can be used, a loaner in conjunction with another access device, to obtain money, goods, or services. And this is the language that Agnuson was looking at when they interpreted the statute. Yeah, but the question is whether used means working or they're just the kind of things that are used to that end. That's the problem under the E3 definition, which says that it includes devices that are expired, revoked, or canceled. In other words, they will not actually work. And that's the question. Well, they will not necessarily work if you put them in a machine and it doesn't spit out money, but they can be used for other things. And that's what de Bazian was talking about. And even Agnuson, when it went back, the government actually put in evidence that said these particular cards, this is what they actually are. And I don't remember offhand whether they were expired or anything like that. They put in evidence that said, yes, these things can't be put in an ATM to get money out, but they can be used to do X, Y, and Z. Because they're the type of thing. I mean, I guess that's the statutory interpretation question. Other means of account access is that type of thing. It's not your Van Gogh painting on the wall. It's a card or an account. Right. And that actually brings up an interesting point. That's part of why we need a little bit more proof in some situations, because we may not necessarily know what this particular thing is. And I don't want to say access device, because that's what I'm talking about here. That's what we're talking about. We need to know a little bit more about what this thing is, how it works, and whether it can be used under certain circumstances. And I have no problem with Aniso's definition. In fact, that's what I want this court to adopt, is this just a little bit. The government's got to put that in. And turning to the facts of this case, that's a large part of the dispute here, was we don't have a lot of information about what the vast majority of these things were. We know that basically the parties agreed at the end that there were 262 card numbers available. Like credit, debit, gift cards, I thought. My understanding was they were basically numbers that were received and then put on gift cards. The question is, how exactly does that work? So what we're arguing, what we'd like, is more information about those other 178. And it matters a lot, because what ended up happening here was, if this was a $42,000 loss, we're talking about between, I think it's 12 to 18 months. That doubles under what the district court found up to $151,000. And as the court knows, and as I've talked about in other cases, the issue is loss amount drives sentencing. It's just like the drug tables. The drug amounts drive sentencing, and that's the starting point. If there's no other questions right now, I'll reserve the rest of my time. Okay, that's fine. Mr. Edenfield. May it please the court, Scott Edenfield on behalf of the United States. The court should affirm the district court's sentence of Mr. Poposky in this case. The district court correctly concluded that the stolen debit and credit card numbers in this case were, in fact, unauthorized access devices. And in the language of the statute, it defines access devices, any card, code, or account number that can be used to obtain money. And then defines unauthorized access devices as any access device that's lost, stolen, expired, revoked, or canceled. And that is exactly what we have in this case. Now, do you think there's a conflict between Agnuso and Moon, or do you think that these cases can be reconciled? I believe that the cases can be reconciled, Your Honor. And I think what the district court said about Agnuso at the sentencing hearing is pretty apt. The court said that what the Ninth Circuit did in Agnuso was kind of mix the intent and the access device requirement. And said in this particular case, government, in the Ninth Circuit case, you don't have it. And if we look at what the Ninth Circuit had there, they had a spreadsheet that had a list of credit card numbers that had been expired for over three years. And it said what it faulted the government for, and this is the quote from Agnuso, is that the government made no showing that the defendant in that case ever took steps or attempted to use the expired numbers, or that the defendant possessed them prior to the cards expiring. We have both of those things in this case. First, we know how these cards were obtained. It's in the plea agreement as well as the pre-sentence investigation report. They were either skimmed overseas, legitimate numbers were obtained, or they were obtained from computers that housed the card numbers. They were then brought here to the United States. Those fraudulently obtained numbers were encoded onto cards. And Mr. Poposky and his co-defendants then took those cards to automated teller machines to try to obtain cash. So unlike what the government's proof was in Agnuso, we have here, there actually were steps taken to use those numbers in an attempt to obtain cash. Does it matter whether steps were taken for all of the cards or just that they were sitting there waiting to be used? Your Honor, the guidelines allow for an estimate, but what we know in this case, and it's in the pre-sentence investigation report at paragraph 41, the defense counsel acknowledged that for the purposes of calculating intended loss, there were 262 credit cards attributable to the defendant, which is where we get that $500 per card number, which gets us to the $131,000 loss amount. And based on the concessions made in the plea agreement, it's clear again that how those numbers got to Mr. Poposky and his co-defendants, the fact that they encoded those into cards and attempted to obtain cash from them, makes this case different than what the Ninth Circuit was dealing with in Agnuso. And along the second prong as well of what the Ninth Circuit said would suffice as proof was that the defendant, they were looking for proof that the defendant in that case possessed the card numbers before expiration. Well, here we know that co-schemers, and again it's through the admission in the plea agreement, co-schemers obtained these numbers through either skimming or obtaining them from computers where the numbers were housed. So at that moment in time, they are certainly access devices because they're being used legitimately by the customer in that particular instance. So looking at the plain language. The ESSO court asked that it's a raw argument. Aren't there some clear limits? Would credit card numbers that expired 35 years ago be covered under the statute, any proof that they were still usable in some manner? And, Your Honor, I would answer that question the same way the government in Agnuso did, and that 35-year-old cards with no other proof would not be access devices because I think that as the district court. Why not? The statute seems quite plain that they are. Why do you give away the statute? The language in the statute is favorable. Once you give away the language of the statute and you're just asking us to make it all up as we go, why should we make it up your way? And, Your Honor, I would not ask the court to make it all up. Right. So stand on the language of the statute and say, of course, it would be stupid to prosecute for a 35-year-old card, but statutory language sometimes requires stupid things. Once you give up the language of the statute, you're in quicksand. And I understand, Your Honor, and then looking at the language of the statute, would those be unauthorized access devices? What the statute says about unauthorized access devices is it includes lost, stolen, expired cards. So under that plain language of the statute, Your Honor's correct. The 35-year-old cards would be, in fact, access devices. I think what Agnuso was looking at, though, was more of an intent question. Was there in that particular case where those cards were not 35 years old, they were only 3 years old, it's almost an intent or a relevant conduct question. Was the person in that case intending to use those in any way such that they should be evaluated and included in the conduct? And I think that even more so with the 35-year-old cards, that would raise the same question. But I agree with Your Honor. Under the plain language of the statute, those are, in fact, counterfeit access devices. Well, as I frequently remind people, not every part of every statute has to do all of the work. Usually, you know, it might be an access device, but there might be some other issue. Or the government may just have trouble after 35 years putting together a case that you'd like to take to the grand jury. And, Your Honor, I think... Like the statute will imitate. And, Your Honor, I think one of the things that would play into that would be Section 1029A itself because there is an intent to defraud requirement in the production of a counterfeit access device or the transfer or use of an unauthorized access device. So I think that would play in, too, as well as the statute of limitations in limiting that kind of prosecution on such old credit cards or access devices. But, Your Honor, if you look at what the Ninth Circuit was looking for in Omyesu, I think we have those things in this case. And under the plain terms of the statute, these were, in fact, unauthorized access devices. They were obtained through theft. They were obtained through fraud. And Mr. Popofsky and his co-defendants attempted to use those to obtain funds. For that reason, we would ask the court to affirm the sentence of the district court. Thank you. Anything further, Mr. Van Zandt? Just very briefly, Your Honor, just about the... I take the court's point on the 35-year-old card issue, and I think the court in Omyesu did as well. The issue is not whether or not a 35-year-old card falls within the statute because it says expired, revoked, or anything like that. The question is what quantum of proof is required to be able to prosecute using that 35-year-old card. And what the court in Omyesu ultimately said was a 35-year-old card might be an access device, but we require a little bit more proof to see how such a card might be used. And that's overall my main point in this case is there's got to be something more when it's something other than just being used. If there's no further questions. I see none, so thank you very much, and we appreciate your accepting the appointment in this case, Mr. Van Zandt. Thank you. Thank you, Your Honor. Thank you for joining us. Thanks as well to the government.